All right. Our second case is 21-1571, Karp v. First Connecticut Bancorp. Mr. Monteverdi, whenever you're ready, sir. Yes. Hi. Good morning. Juan Monteverdi with Monteverdi & Associates for plaintiff appellant. May it please the Court. This morning we're asking that dismissal from the lower court be reversed, the case be remanded, and, frankly, be reassigned. Because the court, the law, granted defendant's summary judgment hours, just hours before we're about to file our opposition to defendant's motion for summary judgment and two doubler motions to exclude the defendant's experts from having opinions for trial. What would you have included in your pleading that you didn't get to pursue that wasn't already in your own motion for summary judgment? Well, two things. One would have been testimony that we had from the defendant's witnesses, the director and the CEO, that was not in our opening brief. Mainly, and I brought it with me because I think it's important. It goes to the negligence issue. And we ask the independent director, did you understand at the time that the actual metric for cash flow had not been disclosed? And he answered, I didn't give it much thought, but it wasn't there. I didn't see it. And then we followed up, do you recall if there was a disclosure as to what line item of projections to include in the proxy? Answer, that would be, that was management decision, not the board decision. And the management decided what to put in the proxy statement. He answered yes. And we deposed the CEO, Mr. Patrick, and we asked him, did you consider, did you consider you personally what projections should be included in this document? And he said, no, I did not. And that's at A1168, which was not in our opening brief. And that would have shown the judge that we have evidence of negligence. He might have still not granted our summary judgment, the plaintiff, but certainly there was a genuine material dispute at issue for the jury to consider. And more importantly, our Dabur motions. We don't think the experts the defendants put forth were adequate. One of them, Mr. Foster, which is the one that introduces the idea of custom and practice, was a defendant himself when he was a board of director because they screwed up the proxy. They didn't put the right statute in Delaware statute for appraisal. And he's the person saying, I know how this should go. Well, I don't think so, because he himself made a mistake when he was a board of director. So far you've been talking about things you would have put in going to the negligence question. Was there anything going to materiality or misleadingness that you didn't have a chance to put in to your opening? I think what happened with materiality is also twofold. One, yes, we would have refocused, because I think the court, reading the opinion, and I suppose after it read defendant's motion for summary judgment, came to that opinion, made a couple mistakes, which are not the law. One, the state of mind. There is no mens rea in a 14a case. So we would have been able to focus that issue with the court to explain that. Can I just ask you just one last question on this procedural issue you've raised? I do understand your argument that, you know, by the time it all happened, it was kind of too late to object in some sense. But I guess I am thinking that if you had stuff you wanted to get in front of the district court, I mean, even after the fact, you could have objected or moved for reconsideration. It just seems very late to start this whole thing over so that the district court can read your, you know, additional arguments. The judge entered a ruling and closed the case on PACER. You could see, case closed. I mean, I think we came to the right timing because the judge below has clearly shown partiality to the defendants. And just to preserve the appearance of impartiality, if you choose to remand the case, which I think you should just on procedural grounds, even if you don't agree on the merit, I think we need to be giving a different judge that has not made up his or her mind before reads our brief, which is what happened here. So I think, I don't think it's fair to require us, well, even if you think you're going to lose because he's telling you you're losing, you should try to move for reconsideration because he's shown a complete disdain for this case. And I think it happened because he just read another ruling from Judge Hollander, I guess, in the Hurtado v. Gramercy property, but that case is very different. For one, they had cash flows disclosed. And for two, there was no discovery. And here we conducted discovery and we learned. And we think we have a reasonable theory to present to the jury. They didn't disclose the cash flows because they had downwardly adjusted them significantly. And how is that material or misleading? Because if you're telling me to rely on Piper Jaffray's analysis to support the transaction based on a discounted cash flow analysis, which they did, and your 22 numbers, cash flows in June 2018 used were $13.5 million. The ones in November 2017 for the same year were $20 million. That's one-third. Did Appellant consider the cash flow before voting? Yes. Well, he doesn't remember how he voted. He doesn't even know if he voted. But he doesn't have to because there's no reliance requirement. That's the whole distinction between a 14A and a 10B-5 case. There's no reliance. And you can tell me if I'm wrong, but as I understand the law in this area, there has to be a material emission that renders what is said misleading. And I guess I am just not understanding how this description of the discounted cash flow analysis is in any way misleading, even if I assume that somehow, like the bottom line number that they started from as their earnings estimates was material, and even if I assume it was wrong, it was too low. Like, all of this is still true. Well, no, because the proxy essentially, it's sort of the defendant's opportunity to tout the transaction. And the way they tout it is they say... Can you point me to the part in this misleading by the omission of the earnings estimates. All this says is we started with an earning estimate. It doesn't vouch for it. It doesn't say it was high, low, consistent with what happened the year before. And elsewhere, the same document says estimates are just estimates. We are not vouching for their accuracy. So all this thing says is we started with an estimate, the accuracy of which we do not vouch for, and then we did this to it, and then we did that to it, and then we did that to it, and then here's the number that came out the other end. All of that is true. It doesn't matter what the input was. And then we give the board a fairness opinion. And they use that analysis to support it. And the board touts the fairness opinion. And the banker could have not rendered a fairness opinion if the cash flows were higher. That's the issue. And those are issues for trial. Those are not issues at summary judgment. And our expert said as much. And our expert testified, or opined, I should say, that he found cash flows would be material here. He also opined that the November 2017 projections were not stale and were the ones that should have been used. And the defendants moved to exclude Mr. Kidd's testimony. They filed a DABOR motion. The lower court did not rule on it because it said it was smooth, because it ruled in favor of the defendants at summary judgment. But it appears it acted as if it was granted, in his mind, because he didn't rely on plaintiff's expert, only relied on defendant's expert, and didn't have the opportunity to review our opposition, not just at summary judgment, but to the DABOR motion that was pending against plaintiff's expert. Procedurally, this case is a nightmare. I recognize that. But I don't want to stay there. I want to move on. And we do have on the merits three independent reasons to support reversal on the materiality. We've talked a little bit about it. I don't know how I cannot convince you that if you are hiding the cash flows from the shareholders, and you have manipulated them, and you give that to your shareholders, how that's not material. And I think there's a great quote from the Northern District of California, the Grizzly case, I think it's called, where it describes what an average shareholder or investor is. And it's a capitalist that wants to consider projections when assessing the value of its shares. And that's what we're dealing with here. We're dealing with capitalists that need to understand what their shares are worth. And when you lie to them— If there had been no earlier cash flow projections back in November that you indicate are really important for a reasonable investor to know, those would not have existed. And all we're left with is a proxy that simply doesn't identify the detail that you would prefer the cash flow analysis. It just ultimately renders a fairness opinion. That's a different case, isn't it? Or would you still have a problem? I think that's a different case. And I think— So what this case is about is really the earlier cash flow, discounted cash flow that wasn't disclosed to your client? Well, I don't think it's like the St. Jude situation where they changed the theory of the case in the middle of the case. Here, we knew there was an omission. We prevailed at the motion to dismiss. Then we conduct discovery. At discovery, we were able to now figure out why the omission actually happened. It sounds kind of like, if you're agreeing, that the case that Judge Diaz hypothesizes is at least a very different case. Maybe you shouldn't have prevailed at the motion to dismiss stage because that was the only thing in your complaint. No, because it's a different standard. I think materiality at a motion to dismiss is a lower burden than I think a pure omission when you're able to allege you missed some— I mean, yes and no, like under the—I can never remember my acronyms today, but under the— PSLRA. Heightened pleading standard, right? You actually have to plead exactly what you're talking about. There's nothing in there about their cash flow estimates were lower than they are supposed to be because two years earlier they were hired. That's not in the complaint. No, but there's an omission, right? And we had law rely on Delaware Chancery Court rulings like merit capital that granted an injunction. And remind you, we sought an injunction. It was just not heard due to the schedule of the court. We originally moved to enjoin the vote because the cash flows had not been disclosed. There's case law that says that's material information. And certainly at a motion to dismiss, it's not unheard of that you're able to prevail. It's a lower standard. Even with the heightened scrutiny that the PSLRA provides. But maybe you can say we got lucky during discovery to be able to really hone in on the issue, perhaps, or perhaps that actually is why they omitted the cash flows. And it makes sense that if you have cash flows that were higher— Isn't the expert testimony undisputed in this case that nobody includes the numbers? No. Two out of 88. You all dispute that? We do. That's another problem. Mr. Keith actually says no. He reviewed many merger and acquisition transactions and he found cash flows are always, mostly always included. Their expert focus only on banks. Your experts had reviewed a number of proxy statements and found that this information usually was not included. No, that's their expert. Well, I know theirs did too, but I thought that one of yours did as well. No, mine the opposite. In fact, mine also testified or opined that he believes it should always be included. Which one is yours? Mr. Keith. That it should always be included or it is always included? Should always be included. Well, that's a different question, right? No, no, no. Two different issues. He did opine that they're always, mostly always included. The defendant's expert said no, except they did an analysis of 44 companies and even their own analysis showed one of them on one instance. How did he define mostly always included? What does that mean? Just mergers in general and the defendants were focusing only on specific regional bank transactions. And we took issue with that because we said that is not an appropriate assessment. But even if you only focus on the regional bank analysis that the defendant's expert did, in one instance out of 40, I think it was, or 44, there was a disclosure of cash flow. And again, that goes to, at least it goes to not supporting summary judgment because that is at least enough for a jury to consider should that be the one instance here also or should it not be? That's a material question. I'll briefly touch on damages. I will say before I move to the issue of negligence, because there's some issue about the standard of care. That's usually in the jury instructions and even on the exhibits that the defendants submitted with their summary judgment at exhibit 26 and 27, you see it, the description of negligence and the standard of care. That is not something that experts normally testify on. The Shanahan case is different because that was a complicated tax and options issue. But on damages, the court below didn't follow Supreme Court precedent, which is Mills and Virginia Bank shares. And it really, you have to break down the two elements. There's transaction loss and economic loss. And transaction loss really is the merger and the proxy used to get the merger approval. And economic loss is the proximate cause. And this statute prohibits soliciting votes of shareholders with a misleading proxy. That's the conduct. And if the conduct is wrongful of the board of directors, then it's the proximate cause for the damages, which is receiving unfair price of the merger. And all we're asking this Court is to follow Supreme Court precedent and even your own precedent. Back in 1989, this Court had Virginia Bank shares before it went to the Supreme Court. And there it required a plaintiff to establish three things, that the proxy omits or misleads a material fact, that defendants are negligent in drafting the proxy, and that the proxy causes the injury. We have those elements. We have alleged them. The court below rushed to granting judgment for the defendants. And it didn't consider the plaintiff evidence. And we ask that the case be remanded and please reassigned so we can have an impartial judge consider this matter. Thank you. Thank you, counsel. Mr. Long. Good morning, and may it please the Court. My name is Robert Long from Alston & Byrd, and I represent the appellees in this matter. Plaintiff can't prove the 14a element, so he has tried to reduce the 14a claim to a single element that all he has to provide evidence of is a material omission. That's not the right test. Every circuit that has considered that has rejected that test, and this Court should not be the first to adopt it. Instead, under the applicable law, plaintiff has to show that the alleged omission is materially misleading, that there was loss causation, and that there was negligence. There are three key points in the factual record that are undisputed and demonstrate why plaintiff cannot meet any of those elements. First, plaintiff has no loss causation evidence, none. That is, plaintiff has no evidence that the omission of the cash flows or even the merger caused any economic harm to plaintiffs, to the First Connecticut shareholders at all. Second, plaintiff has no evidence establishing that the merger proxy failed to provide a fair and accurate summary of the work performed by First Connecticut's financial advisors. That's all that Section 14a requires, but even if you wanted to look beyond that and ask yourself the question, were the omissions misleading? There is no evidence, even by his own expert, that that is the case. Third, plaintiff has no evidence that defendants breached the standard of care that an ordinarily prudent director would have used in similar circumstances. That is required to demonstrate negligence. So each of those independently would be enough to justify dismissal in this case, and he didn't have any of the three, so summary judgment is the right result. So I'd like to now turn first to loss causation. In Dura and Stone Ridge, the Supreme Court said, look, if you are a private plaintiff and you are going to be seeking economic damages, economic recovery, then you have to show that the violation you're alleging showed economic loss. That's what they say. It's a pretty basic common-sense element of a claim. And in the wake of that, courts have realized that, yes, while Mills is out there and Mills says that if a transaction goes forward by a misleading statement, that can be transaction causation. We also have to consider loss causation as it's set out by Dura and Stone Ridge. So transaction causation is one thing that does need to be considered, and then loss causation also needs to be considered. Now, plaintiffs argue that we should ignore Dura, that we should ignore all the circuits that have found that there's both transaction causation and loss causation. But, I mean, I don't know what to say about that. The Supreme Court law is clear. He argues that, well, Dura was limited to 10b claims, and this is a 14a claim, and that's totally different. So, Counselor, I mean, I did look into this a bit. This actually seemed like kind of, sorry, like the law was not 100 percent clear here. Why are we starting here? Well, I'm happy to talk. Do we have to resolve what looks to be at least somewhat of an open issue? I'm happy to talk about any of the three elements you want to talk about. I think that the loss causation issue is so clear under the established law and the precedent and the other circuit's rulings that you don't even have to reach the other issues. You started by saying there's no loss causation. There's nothing you can trace to this hypothetical misrepresentation, and there's also no loss even if you just have to show that the loss was caused by the transaction, by the merger. I'm not arguing. Which one do you want us to do? I'm not arguing that transaction causation is not met here. Okay. I'm only arguing that he has not tied any, when he's seeking economic recovery, he has to tie the alleged omission to an economic loss, and there's no evidence of that here. It has to be a link between the omission itself and the loss. Correct. What if you only have to show that the merger caused a loss? Well, I mean, that would you be saying that Dura doesn't apply for some reason? Could he show that here? No. Well, oh, I'm sorry. Could he show that he has transaction causation? Can he show that? Are you conceding that if all he has to show is that the merger caused financial loss, he can show that here? Yes, he can show that. All right. So back to Dura, and, you know, I'm going to continue with my loss causation points unless you all just want me to move on to materiality or negligence. Back to Dura. He argues that Dura shouldn't apply because the loss causation is only with respect to 10B claims. But that's not what Dura says. Dura says that under the PSLRA, which 14A is part of, you do not have to show loss causation when you are a private litigant. And that is exactly what we have here. So Dura applies, and Dura also notes that you have to be able to show injury. And even Mills notes that in its decision. So moving on to the element of a material misrepresentation. Plaintiff has made a lot of the fact that they have an expert who says that this omission is material. Which omission are you talking about? The omission of the May 2018 cash flows from Piper Jaffray's discounted cash flow analysis. So his argument and his complaint. You don't concede that the theory is a little bit broader in the sense that he's arguing that the earlier omitted cash flows were part and parcel of the misleading statement here? He does argue that. He has no evidence to support that, but he does argue that. What do you mean he has no evidence? I thought the Court engaged with that. His expert never opines that the November 2017 cash flows should have been disclosed in the proxy. That is nowhere in the record. You need an expert for that? I mean, it seems intuitive to me that an investor would want to know if the same advisor who advised the Board as to the final, quote, final projections had, what was it, three, four, five months earlier, calculated a completely different discounted cash flow. I mean, that seems relevant to a reasonable investor. Well, superficially, I can understand that reaction. The testimony, the evidence in the case is that, first, those cash flows, the November cash flows, were done as illustrative, and it was not a rigorous, discrete financial analysis. They were just something that the Piper people came up with on their own, with no input whatsoever from First Connecticut. They were not engaged by First Connecticut at the time. They were not considering the merger transaction that is at issue in this case. That transaction wasn't even on the table and hadn't been announced when they did those projections. It was not submitted to Piper Chaffrey's Fairness Committee that does an analysis of whether the cash flows and all the financial inputs are proper. It was not for the people's merger, as I mentioned. It was his testimony says, Mr. Hutchinson, who was the Piper person who did the analysis, said that was seven months before. It was not comparable to the cash flows that we used in the merger. And it was a specific moment in time. And if you look at the proxy statement itself, it says this valuation is as of June 2018, and it is only valid for that point in time. So the November 2017 cash flow projections are a red herring. I know there are more. I know they want to use, make much of it. But even in his expert's own analysis, own valuation, the $3 more that he says, he doesn't even use the November 2017 cash projections. He has his own cash projections that he uses. So when he gets that higher number, that is not number that came from Piper or First Connecticut. And, by the way, in the proxy itself, one of the free stock price analyses that it does gives a stock price that's even higher than the one that plaintiff's expert gives when he says it was $3.18 more. The proxy itself gives one that's $3 and, I don't know, 25 cents more than the actual value. So it's not like the shareholders didn't know that it was possible that the potential per share price value was what Mr. Keith says it should have been. So that's why the November 2017 projections aren't relevant to whether the cash flows that were actually used in the projections, and even if they were somehow relevant, which they're not, there's nothing that suggests that. And, in fact, Mr. Hutchinson testified he never downwardly adjusted the cash flows. They have no evidence that contradicts that. So what could possibly be misleading about this case? This own court has held in Willis-Towers that it can't just be an omission. It has to be a misleading one. And Mr. Keith never says that the omission was misleading, the expert. There's no evidence other than Mr. Keith's expert on materiality. His own plaintiff, as the Court has noted, didn't even read any of the sections we're talking about before he filed suit. So the expert never says that the Piper cash flows were wrong. He says that the Piper cash flows were or Piper's analysis was flawed, that it was deficient because it didn't contain the cash flows. He quibbles with the inputs that Piper uses for the cash flows, but he doesn't say that the valuation that they came up with in their cash flow analysis was wrong. He just said he doesn't like them. The fact that the appellant didn't have the opportunity to file the pleading in opposition to the motion for summary judgment before it was ruled upon. Right. We've heard what plaintiffs say they would have argued if they hadn't done what they did or if the judge hadn't done what he did. I am putting aside whether he could have excluded our expert. He had plenty of time before that decision was made to file a motion to exclude the experts. He could have done that in his own motion for summary judgment, like we did. That's when we filed our motion. He had that time. And beyond that, he could have done a motion for reconsideration. And he puts forth a couple of things that he would have said differently, but that does not deal with materiality, that doesn't deal with the misrepresentation issue, nor does it deal with loss causation. Do you have any of this is, you know, it's unusual for a district court to do this, to have a scheduling order and then grant summary judgment before the opposition brief comes in. Do you have any idea what happened here? We're good advocates. I was just wondering whether, and I can ask the colleague the same thing, this is an unusual procedural posture we find ourselves in. Yeah. Obviously, we agreed with the Court's opinion. And I think you look back at the record and everything, all the transcripts that he's talking about were already there. They had been submitted. So I don't know what he's talking about when he says the depositions weren't in front of the court. All the information was there for the court to use and decide. Can I come back to one thing? Because I think I misheard you on a question that you asked. On the transaction causation, I only mean that they have satisfied the element of the transaction causation. That's the part where the proxy causes the transaction. Right. But you are not conceding that if for loss causation, all you have to show is that the merger caused the loss. Yes. You're not conceding that they can show that. My colleague, Tim Fitzmorris, was feverishly writing that down. Thank you. I'm sure I asked the question wrong. Thank you. I was surprised. Okay. So, okay. A couple of other points on materiality. They're arguing it was material omission and they would have gotten a higher value. Well, the undisputed testimony is that People's Bank, the acquirer, would not have paid a dime more or a penny more per share of stock. So unless they have something to dispute that, and they don't even have a competing bid, they don't have any evidence that there was anybody objecting to the omission. None of the analysts. And there were a bunch of analysts. So analysts are like reporters for companies, you know. They're the paparazzi of the companies. Nobody was commenting on the lack of omission of the cash or the omission of the cash flows. Not one person said it. The shareholder vote was almost 96% in favor. The ISS, which is one of the institutional shareholder services, they recommended the merger. None of them had any complaints, and that's really a quite significant thing. I mean, people, companies wait with bated breath to see what the ISS is going to say because that can be an important approval of the merger and its process. And if anything, analysts were saying, well, People's stock, the acquirer's stock, went down so it looks like they paid too much for First Connecticut. It was a substantial premium over the actual share price. There's no evidence that the share price that they are arguing should be the share price was ever achieved by First Connecticut. It had never gotten that high in the whole history of the bank. All right. Negligence. This is not a car rear-ending another car. This is a case where the question is, would a reasonable director raise their hands and say, hey, in this 180-page proxy, I notice that there's one line item of cash flow projections missing, and gosh, shouldn't we evaluate those and include those? The ordinary person walking around on the street is just not going to have the answer to that question. Okay? PhDs walking down the street are not going to have the answer to that question. Most business people would not have the answer to that question. So plaintiff has to explain to us for a negligence claim what the standard should be and how they should meet it. And plaintiff puts forth zero evidence. His expert doesn't say it. His expert doesn't put forth the standard. Nor does do any of he never asked that question of any of the defendants or their experts. And his class plaintiff didn't read it and doesn't even know what it said. So there's just no evidence there. And the plaintiff argues that there should be. That's the decision for the judge. That's just not true. There are a number of cases that make clear that you have to put forward the negligence standard if you're going to make a claim, or you have to put forth evidence of the standard to put forth a negligence claim. Shanahan and Ginder are the best examples of that. So in general, at best, what plaintiff argues and what he said he was going to put forth in his reply is that they should have known to identify this one line in the 180-page proxy, one line from three separate evaluations. That's just not enough. And therefore, for all the reasons that I identified, this case should be dismissed. Oh, my. Any further questions? Thank you very much. Thank you, Mr. Long. Mr. Monteverdi, you have some rebuttal? Sure. I'll try to address the points in the order he presented them. On the loss causation, I think it's important to understand what Dura says and what Dura doesn't say. And the reason we make the distinguishing issue, that was a 10b-5, because in 10b-5, what are you governing or what are you trying to exert oversight over is the buying and selling of a stock in the public market based on a misleading statement. And what normally happens is if a company is lying about its revenues, the truth emerges, and then the stock plummets. That's a traditional 10b-5. In a merger case, that is not the conduct that we are trying to supervise. It's not the buy or sell of the shares. It's the solicitation of the votes. It's a very important distinction. That's why Dura itself, the Supreme Court said, we're not saying this is how you prove economic loss in other contexts. They say that. They are self-restraining to that circumstance. In a merger case, the conduct we're trying to govern or police is soliciting votes. If you're going to solicit votes with a misleading statement that then causes the merger and the merger is for an unfair price and a plaintiff can check all those boxes, you have damages. That's what Virginia Bankshear said. That's what Mill said. And that's what the Baum v. Harmon International opinion, that's a district court opinion, I recognize that, but we did submit supplemental authority on that point, said, and it makes sense because this is a merger. It's not a fraud on the market. So that's a distinction I ask that you consider because it's a relevant distinction. And then our expert, Mr. Kidd, says the shareholders were damaged $3.18 because the merger was unfair. They could not get the merger approved if they didn't get the solicitation of the votes without a misleading proxy. Mr. Monteverdi, as your colleague on the other side says, that there's just simply no evidence that there was any other willing bidder and no evidence that the company that bought the shares was willing to pay anything more. I have two responses to that. One, then you don't sell. It's like if you want to sell your home, Your Honor, and you're not getting a buyer that's willing to pay what you think is fair price, you don't sell. They're not required to sell. It's not mandatory. And two, I've never heard of a buyer. Is there any evidence? And if they hadn't sold, then what would the price of the stock have been? Wasn't it at like $26 or something? Yeah. Okay. If you have a product that— Well, then doesn't not selling—I'm not— If they hadn't sold, then the stock would have been worth less. Maybe, but it's intrinsic value. I mean, I'm not going to suggest— But we know what it's trading at, and is there any evidence that there was something like glitchy in the market and it really was undervalued for some reason? I don't have any evidence, but under that theory— It's not alleged or anything. You're right. I'm not asking you about that. It's alleged that the company is worth more money, but I'm not alleging that we can obtain that more money tomorrow, and that is not how these cases are valued. I mean, that's the whole point we have. Also, by the way, if you're not disclosing to the market your true projections, I don't know how the market can actually properly value you. So we have a lot of problems there, but these are material disputes. They're not issues for summary judgment. And the issue that the buyer wasn't willing to pay more, I've never heard of a buyer coming to the deposition to say, Yeah, I would have paid more if they asked me for more, to pay more. What was not in front of the court at the time the district court ruled on the motion for summary judgment that you would have included in your opposition? What was not in front of the court? I think the most important would have been our Daubert motions to exclude their experts. And, by the way, we — But as opposing counsel pointed out, you could have filed your Daubert motions. We could do many things, but strategically, normally, we move for summary judgment. Defendants responded. Then they tried to Daubert our experts. I have no thinking they're going to use their experts or move for summary judgment. I don't know if they're going to do it or not. After they move for summary judgment and they Daubert my expert and they put their experts forward, then I will respond and Daubert their experts. I mean, that is just traditional litigation steps. And I don't think we can be chastised for not, you know, guessing. We might have guessed correctly, but guessing that they were going to put their experts forward. And when the trial was not scheduled yet, we normally don't do Daubert motions until either at summary judgment or after. Still, I mean, I do — I really — I am struggling with this, and I do understand what you're saying about, like, well, but then he just did it, and then he closed the case. But it just seems so odd to me that — not odd — why you didn't move to reconsider and say, hang on a second, we need to Daubert their experts. You forgot that part. Maybe I should be more naive and think that he might have changed his mind. Or maybe I'm too jaded. It is what it is. We made a strategic decision that we didn't think we would be able to, the way the judge acted. I've never seen this before. So when someone does something that is completely out of norm, we've got to change tact. It just seems like it could have been an oversight. Like, oh, I didn't know you all had Daubert motions you wanted me to look at. Sure, okay. Okay, but we are where we are today. And my expert at 8-1217, which is important, 8-1217, he says proxies regularly include and it's customary to include cash flows. They didn't have them. It's a problem. And then we found out in discovery probably the reason is because they manipulated them. And they didn't want the shareholders to find that out. And they could have not obtained a fairness opinion. And shareholders, at the end of the day, they got shortchanged. Your expert opinion was in front of the district court? Your expert's report was in front of the district court. Yes, yes. But when someone opposes you and you want a response, sometimes you can redirect the court or explain to the court it's there and this is how that helps here. We didn't get to do that. Procedurally, I think this case has to be remanded. What we're suggesting is not only remand it, but it be reassigned so we have a fresh set of eyes, which I think it's appropriate request here. And, frankly, it's unfair to force a judge to reconsider things that he clearly has already made his mind up on. Thank you very much. Thank you, Mr. Monteverdi. All right, we'll come down and greet counsel and move on to our next case.
judges: Albert Diaz, Stephanie D. Thacker, Pamela A. Harris